IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs July 29, 2020

**STATE OF TENNESSEE v. TERRY WILLIAM SMITH**

**Appeal from the Criminal Court for Hamilton County**
**No. 299659     Don Poole, Judge**

───────────────

**No. E2019-01572-CCA-R3-CD**

───────────────

The defendant, Terry William Smith, appeals his 2019 Hamilton County Criminal Court jury convictions of speeding, failure to obey a traffic control signal, reckless endangerment, evading arrest, violating the open container law, and driving under the influence, arguing that the evidence was insufficient to support some of his convictions and that the trial court erred by ordering a sentence of split confinement.  We affirm the defendant's convictions, the imposition of a two-year effective sentence, and the trial court's decision to order split confinement.  Because the confinement term of the split confinement sentence exceeds that allowed under the terms of Code section 40-35-501(a)(3), we modify the term of confinement and remand the case for the entry of corrected judgment forms reflecting the modified sentence and the proper place of confinement.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed as Modified;**
**Remanded**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE, and D. KELLY THOMAS, JR., JJ., joined.

Mike Acuff, Chattanooga, Tennessee, for the appellant, Terry William Smith.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Neal Pinkston, District Attorney General; and Chris Post, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

         The Hamilton County Grand Jury charged the defendant with one count each of speeding, failure to maintain lane, failure to obey a traffic control device, reckless endangerment, evading arrest, violating the open container law, driving under the influence

("DUI"), and driving with a blood alcohol concentration in excess of .08 percent ("DUI per se") for his actions that precipitated a traffic stop on November 26, 2015.

At the February 2019 trial, Chattanooga Police Department ("CPD") Officer Jeffrey Buckner testified that at approximately 1:00 a.m. on November 26, 2015, he "was sitting on I-75 southbound" at the "nine mile marker" using his radar to monitor the speed of the passing vehicles when the rear radar alerted him to the fact that an approaching vehicle was traveling at 110 miles per hour. He looked over his shoulder and observed "a black sedan [traveling] at a high speed." As the black sedan approached his patrol car, "it did start to slow down" and was traveling at "[a]round 80 miles an hour" as it passed him. Officer Buckner then "began to try to catch up to the vehicle," which required him "to accelerate as fast as I could because I was already coming from a dead stop to catch up to this vehicle." He recalled that he reached a speed of 125 miles per hour in his effort to catch the vehicle.

As Officer Buckner "began to get closer," he initiated his emergency equipment, and the sedan exited "at Bonny Oaks, Exit 7." He testified that he saw "the vehicle taking the exit curving to the right" and then saw it "brush against that wall and come back into its lane" before continuing "straight on the exit ramp." At the end of the exit ramp, Officer Buckner observed that "we did have a red light facing us, Bonny Oaks had a green light on the opposing traffic." He also observed "a vehicle coming on Bonny Oaks towards the intersection." The black sedan "did not make any attempt to stop but traveled straight through the intersection . . . and actually went straight when there was no lane for straight travel and took the I-75 southbound entrance ramp and got back on the interstate." Because Officer Buckner "felt that this was a maneuver to evade" him, he decided "to disengage and turn my lights and sirens off because I was in fear of this causing damage or death to anybody."

Officer Buckner reactivated his emergency equipment after "watching the vehicle get back on the interstate," because he "noticed it was now actually driving in a different behavior but was actually at a slower speed." He followed the black sedan onto the interstate and caught up with it "around the 6.4 mile marker of 75 south." The driver "took a prolonged time to pull over." Officer Buckner testified that he effectuated a "high risk stop" based upon the driver's earlier behavior and the fact that his "closest backup was a ways away." He called in the stop and requested emergency backup and then "exited but I stayed at my driver door" with his gun drawn. He used the "PA system to give verbal commands." He instructed the driver to exit the vehicle, and the driver eventually did so. Officer Buckner "instructed him to come to my vehicle and place his hands on the hood of my vehicle." Officer Buckner identified the defendant as the driver of the black sedan.

Officer Buckner testified that, when he made personal contact with the defendant, he observed that the defendant "did have watery red eyes, he had a smell what's commonly associated with alcohol or intoxicant coming from his person and breath." Officer Buckner also observed that when the defendant "exited the vehicle he was in a relaxed state, he was not in alert." He also observed that the defendant "looked to be a little unsteady when he exited initially" and when Officer Buckner assisted him into the patrol car. Officer Buckner placed the defendant in handcuffs, patted him down for weapons, and placed him in the back of his patrol car. He said that, based upon the circumstances, he "felt it was better to go ahead and secure him in the vehicle." Officer Buckner "viewed an open container of alcohol in the backseat" within arm's reach of the driver's seat. A photograph of that item, "an empty container of Twisted Tea, Hard Ice Tea" that was still cold when the officer found it, was exhibited to his testimony and displayed to the jury.

Officer Buckner drove the defendant to the Hamilton County Jail, where he applied for a search warrant to draw the defendant's blood. A magistrate signed the warrant, and a nurse drew the defendant's blood. Officer Buckner sealed the sample and placed it "in our property division that takes it up personally to the" Tennessee Bureau of Investigation ("TBI") for testing. That testing established that the defendant had a blood alcohol concentration of .152 percent.

During cross-examination, Officer Buckner acknowledged that, although he observed "cuts and damage to the rim" of one of the tires on the defendant's vehicle, he could not be certain of the age of that damage. He admitted that the defendant told him that he had issues with back pain. The can of Twisted Tea "was not still in full capacity, there was a lower volume," and "it was still cold on the outside of the cup."

During redirect-examination, Officer Buckner said that, as he transported the defendant to the jail, he observed that the odor of an alcoholic beverage, which was not present before the defendant was placed in the patrol car, "did grow stronger."

CPD Investigator Michael Sharp responded on the scene of the traffic stop and "pointed out the damage to the front right tire wheel area of the vehicle."

TBI Special Agent and Forensic Scientist Dawn Sweeney analyzed the blood sample taken from the defendant on November 26, 2015. Her testing established that the defendant's blood "had .152 grams percent of ethyl alcohol."

Following Agent Sweeney's testimony, the State rested. After a full *Momon* colloquy, the defendant elected not to testify and chose to present no proof.

Based upon this evidence, the jury convicted the defendant as charged of speeding, failure to obey a traffic control device, felony reckless endangerment, evading arrest, violating the open container law, and DUI. The jury acquitted the defendant of failure to maintain lane and DUI per se. Following a sentencing hearing, the trial court imposed a total effective sentence of two years to be served as 11 months' and 29 days' incarceration followed by supervised probation.

*I. Sufficiency*

The defendant contends that the evidence was insufficient to support some of his convictions. Sufficient evidence exists to support a conviction if, after considering the evidence—both direct and circumstantial—in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). This court will neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Dorantes*, 331 S.W.3d at 379. The verdict of the jury resolves any questions concerning the credibility of the witnesses, the weight and value of the evidence, and the factual issues raised by the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

In this case, the defendant challenges the sufficiency of the evidence only with regard to his convictions of reckless endangerment, evading arrest, and failure to maintain lane. Because the jury acquitted the defendant of failure to maintain lane, we will not address the sufficiency of the evidence for that charge.

"A person commits an offense who recklessly engages in conduct that places or may place another person in imminent danger of death or serious bodily injury." T.C.A. § 39-13-103(a). A person

> acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

-4-

*Id.* § 39-11-302(c). "Reckless endangerment committed with a deadly weapon is a Class E felony." *Id.* § 39-13-103(b)(2). "An automobile is considered a 'deadly weapon'" for purposes of the reckless endangerment statute. *State v. Wilson*, 211 S.W.3d 714, 719 (Tenn. 2007) (citing *State v. Tate*, 912 S.W.2d 785, 787 (Tenn. Crim. App. 1995)). In order "[f]or the threat of death or serious bodily injury to be 'imminent,' [a] person must be placed in a reasonable probability of danger as opposed to a mere possibility of danger." *State v. Cross*, 362 S.W.3d 512, 524-25 (Tenn. 2012) (quoting *State v. Goodwin*, 143 S.W.3d 771, 777-78 (Tenn. 2004)). The "State may satisfy its burden by demonstrating that a 'person or class of persons' other than the defendant was in the zone of danger," which "has been defined as 'that area in which a reasonable probability exists that the defendant's conduct would place others in imminent danger of death or serious bodily injury if others were present in that zone or area.'" *Cross*, 362 S.W.3d at 524-25 (quoting *Goodwin*, 143 S.W.3d at 778).

"It is unlawful for any person, while operating a motor vehicle on any street, road, alley or highway in this state, to intentionally flee or attempt to elude any law enforcement officer, after having received any signal from the officer to bring the vehicle to a stop." T.C.A. § 39-16-603(b)(1).

Here, the evidence established that Officer Buckner observed the defendant traveling at 110 miles per hour on the interstate in Chattanooga. In order to catch up with the defendant, the officer was forced to accelerate quickly. Officer Buckner activated his emergency equipment when he caught up to the defendant. The defendant passed other cars on the interstate before taking the exit ramp at a high rate of speed. He then sped through a red light, where another vehicle was approaching the intersection, and sped back onto the interstate, where he continued to drive at a high rate of speed before finally pulling over. Although Officer Buckner briefly deactivated his emergency equipment, thinking he would end the chase for the safety of others on the roadway, he reactivated the equipment after realizing that the defendant had slowed somewhat. The defendant continued to drive for some distance before pulling over. Officer Buckner testified that the defendant was unsteady on his feet and smelled of alcohol. Forensic testing established that the defendant had a blood alcohol concentration that was nearly twice the legal limit. Contrary to the defendant's suggestion, the State was not required to show that other drivers were forced to take evasive action to support a conviction of either reckless endangerment or evading arrest. The defendant drove drunk at an extremely high rate of speed and barreled through a red light in an effort to escape Officer Buckner, conduct that was more than sufficient to support the defendant's convictions of felony reckless endangerment and felony evading arrest.

## II. Sentencing

At the sentencing hearing, the defendant testified that he suffered serious injuries in an accident in October 2008 and that he had been unable to work since that accident. The defendant admitted that he had a drinking problem that began in 2013 following the dissolution of his marriage. He said that he "went to a detox, I think it was seven or eight days," but he was not approved for an extended in-patient stay at that time. In addition, he "tried to quit on my own which is very dangerous and I ended up in the emergency room" after he "almost died." He conceded that, at the time of the sentencing hearing, he continued to "drink daily." The defendant predicted that, if forced to serve a sentence of confinement, "It wouldn't be good. I would be sick and end up like I was before when I tried to quit." The defendant, who lived in Indiana at the time of the hearing, said that he had "been in contact with a lady with rehab" in Ohio that was "the only place that I could get where my insurance would cover me for a twenty-one to twenty-eight day program." He admitted that he had been convicted of assault in Sevier County and placed on probation. As a result of that conviction, he attended counseling for anger management. The defendant asked the court to allow him to "do the rehab part . . . and let it be part of the sentencing or whatever and because of the danger that I could go through" during the detoxification process.

During cross-examination, the defendant admitted that he had two previous convictions of reckless driving and that he was serving a sentence of probation for a Sevier County assault conviction at the time of the sentencing hearing. He conceded that he was the subject of two orders of protection at the time of the sentencing hearing. He acknowledged that he had previously been arrested for but not formally charged with DUI. The defendant admitted having consumed alcohol on the day before the sentencing hearing. He said that he had previously attended an alcohol rehabilitation program in 2013.

Upon questioning by the trial court, the defendant acknowledged that he had contacted the rehabilitation program he wanted to attend only two weeks prior to the sentencing hearing. The defendant also said that Officer Buckner was wrong when he said that the defendant was driving at 110 miles per hour. He acknowledged, however, that he "was doing over the speed limit."

The defendant's 18-year-old daughter, Pamela Luttrell, testified that, before the defendant moved to Indiana, the two were close. She said that the defendant was also close with her two half-siblings. She said that the defendant called her daily.

At the conclusion of the hearing, the trial court found in mitigation that the defendant suffered serious injuries in 2008, that he was on disability, and that he had a good relationship with his children. The court enhanced the sentence based upon its finding

-6-

that the defendant had a previous history "for fairly serious misdemeanor convictions." *See* T.C.A. § 40-35-114(1). The trial court applied enhancement factor 10, that the defendant had no hesitation about committing a crime when the risk to human life was high, to the defendant's evading arrest conviction "and other misdemeanors but not the reckless endangerment." The court said that "it would have been preferable" for the defendant to seek help for his alcohol addiction prior to the offenses. The court found that "based on the very, very reckless conduct on I-75[,] . . . he should be confined for a period of time." The court found that a sentence of split confinement was warranted and, accordingly, imposed the following sentences:

| Speeding | 30 days to serve |
| Failure to obey a traffic control device | 30 days to serve |
| Reckless endangerment | Two years, suspended to 11 months' and 29 days' incarceration followed by probation |
| Evading arrest | Two years, suspended to 11 months' and 29 days' incarceration followed by probation |
| Violating the open container law | 30 days to serve |
| DUI | 11 months and 29 days to serve at 50 percent |

The court aligned all the sentences concurrently, for a total effective sentence of two years to be served as 11 months' and 29 days' incarceration followed by probation. Despite that the trial court specifically noted that a sentence to the Department of Correction ("TDOC") was not appropriate in this case, the judgment forms reflect the place of incarceration for the split confinement sentence as TDOC.

Our supreme court has adopted an abuse of discretion standard of review for sentencing and has prescribed "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). The application of the purposes and principles of sentencing involves a consideration of "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant . . . in determining the sentence alternative or length of a term to be imposed." T.C.A. § 40-35-103(5). Trial courts are "required under the 2005 amendments to 'place on the record, either orally or in writing, what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing.'" *Bise*, 380 S.W.3d at 698-99 (quoting T.C.A. § 40-35-210(e)). Under the holding in *Bise*, "[a] sentence should be upheld so long as it is within the appropriate range and the record demonstrates that the

sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709.

The defendant challenges only the manner of service of his sentence, arguing that the trial court erred by ordering that he serve a period of confinement. In our view, no error attends the trial court's decision that an alternative sentence in the form of split confinement was appropriate in this case. We do, however, perceive error in the length of the period of incarceration imposed in this case as well as the imposition of a sentence to TDOC.

Code section 40-36-306 provides that defendants "receiving probation may be required to serve a portion of the sentence in continuous confinement for up to one (1) year in the local jail or workhouse, with probation for a period of time up to and including the statutory maximum time for the class of the conviction offense." T.C.A. § 40-35-306(a). Although this section permits the imposition of a period of continuous confinement up to one year, Code section 40-35-501 provides that, "[n]otwithstanding any other provision of law, inmates with felony sentences of two (2) years or less shall have the remainder of their original sentence suspended upon reaching their release eligibility date." *Id.* § 40-35-501(a)(3). "Release eligibility for each defendant sentenced as a Range I standard offender shall occur after service of thirty percent (30%) of the actual sentence imposed less sentence credits earned and retained by the defendant." *Id.* § 40-35-501(c). Our supreme court has held that, "in sentences of two years or less, defendants have more than a mere hope of release. Instead, they have a right, based on [Code section 40-35-501(a)(3)], to have the remainder of their sentence suspended upon reaching their release eligibility date." *State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "A sentence of split confinement may not be imposed which circumvents the statutory release eligibility date." *Jonathan Thornton v. State*, No. E2003-00393-CCA-R8-PC, slip op. at 3 (Tenn. Crim. App., Knoxville, Mar. 17, 2003) (citing *State v. Stephen Michael Ware*, No. E2000-01952-CCA-R3-CD (Tenn. Crim. App., Knoxville, Aug. 7, 2001)); *State v. David Wayne Fountain*, No. E2004-01226-CCA-R3-CD, slip op. at 5 (Tenn. Crim. App., Knoxville, June 28, 2005) ("This court has consistently held that a confinement term may not exceed the release eligibility date for felony sentences of two years or less." (citations omitted)).

In this case, the defendant received concurrent Range I sentences of two years for each of his Class E felony convictions. The defendant would reach his release eligibility date on his two-year effective sentence after serving 7.2 months, or seven months and six days, *see* T.C.A. § 40-35-502(a)(2) (converting fractions of months into days), of continuous confinement. Consequently, the period of continuous confinement imposed in this case exceeds the period of continuous confinement permitted by Code section 40-35-501(a)(3), and the sentence must be modified. Because the record otherwise supports the

trial court's decision that a period of confinement was warranted in this case, we modify that term of confinement to seven months and six days.

Additionally, as noted above, the judgment forms indicate that the defendant was sentenced to TDOC.  Code section 40-35-314 provides, however, that when "periodic or split confinement not to exceed one (1) year" is directed as part of a sentence of eight years or less, "the court shall designate the place of confinement as a local jail or workhouse."  T.C.A. § 40-35-314(a).  Accordingly, the case must be remanded for the entry of corrected judgments reflecting that the place of incarceration is the local jail or workhouse.

### *III.  Conclusion*

Because the State presented sufficient evidence to support each of the defendant's convictions, we affirm those convictions.  Because the trial court erroneously imposed a term of confinement that exceeds the defendant's release eligibility date, the term of confinement is modified to seven months and six days.  Finally, the judgment forms for the defendant's convictions of reckless endangerment and evading arrest must be corrected to reflect the place of confinement as the local jail or workhouse.

_____
JAMES CURWOOD WITT, JR.